UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------

ZOILO DAVID RODRIGUEZ SANCHEZ,

                         Plaintiff,                **MEMORANDUM & ORDER**
                                                      13-CV-929 (MKB)

        v.

CAROLYN W. COLVIN
*Acting Commissioner, Social Security*
*Administration*,

                         Defendant.

---------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

        Plaintiff Zoilo David Rodriguez Sanchez commenced the above-captioned action seeking review pursuant to 42 U.S.C. 405(g) of a final decision by the Commissioner of Social Security denying his application for disability insurance benefits. Defendant moves for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, claiming that the Commissioner's decision is supported by substantial evidence and should be affirmed. Plaintiff cross-moves for judgment on the pleadings, arguing that Administrative Law Judge Hilton R. Miller (the "ALJ") failed to satisfy his duties in several aspects: (1) the ALJ did not correctly weigh the opinions of Plaintiff's treating source; (2) the ALJ did not correctly account for Plaintiff's complaints about pain in making a credibility determination; and (3) the ALJ improperly considered the vocational expert's testimony. The Court heard oral argument on July 29, 2014. For the reasons set forth below, Defendant's motion for judgment on the pleadings is denied. Plaintiff's cross motion for judgment on the pleadings is granted. The Commissioner's decision is reversed and remanded for further proceedings.

## I. Background

Plaintiff is a 57-year old man who completed ninth grade.  (R. at 91, 303.)  Plaintiff has four children and lives with Yolanda Naravaez, and has no income.  (R. at 302.)  Plaintiff filed for disability benefits on July 28, 2010, claiming that he became eligible on July 10, 2010 due to broken ribs and a broken collarbone stemming from a recent motorcycle accident, as well as depression, asthma, high blood pressure and foot and knee problems.  (R. at 9, 112, 304.) Plaintiff's application was denied on January 13, 2011, and he timely requested a hearing before an ALJ.  (R. at 31–37.)  A hearing was held before the ALJ on April 26, 2012, and Plaintiff, his friend Yolanda Naravaez, and Melissa J. Fass-Karlin, a vocational expert, testified.  (R. at 298.) The ALJ issued a decision on May 9, 2012, finding that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. at 297, 3–17.)  Plaintiff sought review of the ALJ's decision by the Appeals Council.  (R. at 18–19.)  The Appeals Council denied Plaintiff's request for review, making the ALJ decision the final decision of the Commissioner.  (R. at 22–24.)

### a. Plaintiff's testimony

Plaintiff testified that he had broken his clavicle and six ribs in a motorcycle accident in July 2010, and that since the accident he has constant pain in his back and in his legs.  (R. at 305–06, 312.)  Plaintiff tires very easily, and has difficulty both sitting and standing, so he lays down frequently.  (R. at 306.)  Plaintiff can walk comfortably for about one block, but then has to rest.  (R. at 311.)  Plaintiff walks with a cane, which he claims was prescribed to him by a treating physician from the emergency room where he went on July 17, 2010, a few days after his motorcycle accident.  (R. at 311–12.)  Plaintiff can lift about five pounds comfortably, and his clavicle is "still broken," and has not mended.  (*Id.*)  Plaintiff is under the care of Dr. Taylor, who he has been seeing for "a long time."  (R. at 312.)  Plaintiff takes numerous medications for

the pain, including Dilaudid and propranolol, several medications for his asthma including an Albuterol inhaler, and medications for depression and anxiety including Zinecard and Valium. (R. at 308–09.) Plaintiff does not do any laundry, cooking, or cleaning. (R. at 319.) His typical day is comprised of lying down all day in the bed, he feels depressed and does not feel like doing anything, and he has no friends. (R. at 318–19.) Plaintiff has difficulty concentrating and often drops things and forgets things. (R. at 319.)

### b. Plaintiff's work history

Plaintiff worked at a gas station attendant in 1995. (R. at 113.) Plaintiff worked as an operating engineer for a construction company from 1999 to 2003, operating cranes and earth-moving machinery. (R. at 120, 303–04.) Plaintiff did not have to do any heavy lifting. (R. at 121.) Plaintiff stopped working in 2003 or 2004 because he had chronic and severe asthma. (R. at 304.) Plaintiff thereafter worked several odd jobs, including two six-month periods working in his brother's bodega, where he worked "off the books."[1] (R. at 304–05.)

### c. Vocational expert's testimony

Melissa Fass-Karlin, a vocational expert, described Plaintiff's job as a gas station attendant as a medium and semi-skilled occupation with a specific vocational preparation

---

[1] Plaintiff told two medical examiners that his last job was working as a truck driver in 2004, but it is unclear if this refers to his job operating earth-moving machinery. (*See* R. at 220, 226.) Plaintiff also told a medical examiner that he worked as a taxi cab driver for 3 years, and at a gas station for 3 years, but did not provide any further detail, not even the dates of these jobs. (*See* R. at 220.)

("SVP") of 3.[2]  (R. at 314.)  She described Plaintiff's job as a construction worker as classified

as heavy and semi-skilled work with an SVP of 4.  (R. at 315.)  According to Fass-Karlin, if

Plaintiff had the residual functional capacity to perform the functional range of medium work

and had to avoid concentrated exposure to respiratory irritants, jobs that involved foot controls or

pedals, and had to work in simple, repetitive and routine work in a low-stress environment, then

he would be able to work as a hand packager or a meat clerk.  (*Id.*)  The ALJ also asked Fass-

Karlin about work at the light exertional level, and Fass-Karlin identified two jobs: assembler of

small products, and mail clerk, both with an SVP of 2.  (R. at 316–17.)  She also testified that if

Plaintiff's restrictions included being "off task" for 20% of the time, then there would be no

occupational titles suitable for Plaintiff.  (R. at 317.)

### d.  Medical evidence

#### i.  Staten Island University Hospital reports

Plaintiff visited the emergency department of Staten Island University Hospital on July

18, 2010, to be treated for injuries sustained in a motorcycle accident in the Dominican Republic

on July 10, 2010.  (R. at 152, 156.)  Plaintiff reported that he was struck by a motorcycle and fell

on his left side without losing consciousness.  (R. at 161.)  Plaintiff was admitted to the hospital

the following day, on July 19, 2010, with an admitting diagnosis of "multiple rib [fractures]" and

---

[2]  "SVP stands for 'specific vocational preparation,' and refers to the amount of time it takes an individual to learn to do a given job." *Urena-Perez v. Astrue*, No. 06-CV-2589, 2009 WL 1726217, at *20 n.43 (S.D.N.Y. Jan. 6, 2009) (quoting Jeffrey Scott Wolfe & Lisa B. Proszek, *Social Security Disability and the Legal Profession* 163 (2002)), *report and recommendation adopted as modified*, No. 06-CV-2589, 2009 WL 1726212 (S.D.N.Y. June 18, 2009).  An SVP of 2 describes a job that requires training "[a]nything beyond short demonstration up to and including 1 month," while an SVP of 3 requires training "[o]ver 1 month up to and including 3 months."  *Id.*  An SVP of  4 requires training "[o]ver 3 months up to and including 6 months."  *See* Department of Labor, Dictionary of Occupational Titles Appendix C, 1991 WL 688702; also available at http://www.occupationalinfo.org/appendxc_1.html#II.

"clavicle [fracture]." (R. at 159.) An examining physician's report indicated that Plaintiff had left clavicular fracture and multiple rib fractures, asthma that was stable, hypertension that was not well controlled, gastroesophageal reflux ("GERD") and mild anemia. (R. at 166.) The physician ordered X-rays, a cardiothoracic ("CT") scan to rule out pulmonary contusions, and prescribed a sling for the left clavicular fracture.[3] (*Id*.) A radiology report confirmed that Plaintiff had a mid-clavicle fracture with "displacement of the distal fragment," multiple left rib fractures and mild pleural effusion on the left side. (R. at 172.) The CT scan noted a "lucent lesion" in the "right femoral neck with central calcification," and no acute intra-abdominal traumatic injury.[4] (R. at 174, 176.)

The following day, July 20, 2010, Plaintiff was examined by a cardiothoracic surgery specialist, who noted that Plaintiff had a bruise on the back of his left leg along his knee, bruising on his left foot around the heel, and bruising along the sternal area and upper left chest. (R. at 170–71.) The specialist recommended pain control and "aggressive incentive spirometry."[5] (R. at 171.)

### ii. Dr. David Taylor

Based on the medical reports included in the record, between May 10, 2001 and

---

[3] The Staten Island University Hospital medical records do not indicate that Plaintiff was prescribed any pain medication, but on August 9, 2010, Plaintiff reported to his treating physician that he was using Percocet to treat the pain. (R. at 207.)

[4] A lucent lesion of the bone is an indicator of up to eleven conditions, including a simple bone cyst, an infection of the bone, or "non-ossifying fibroma." *See* UW Medicine, Department of Radiology, "Lucent Lesions of the Bone," available at http://www.rad.washington.edu/academics/academic-sections/msk/teaching-materials/online-musculoskeletal-radiology-book/lucent-lesions-of-bone.

[5] Incentive spirometry is a "device to assist lung functioning." *Bagnall v. Sebelius*, No. 11-CV-1703, 2013 WL 5346659, at *4 (D. Conn. Sept. 23, 2013).

November 2009, Plaintiff regularly visited physicians, including his treating physician, Dr. David Taylor, for treatment of asthma, depression, hypertension and insomnia. (R. at 192–206.) Plaintiff was treated for asthma beginning with his May 2001 visit to an unspecified doctor at the same practice as Dr. Taylor, and first reported his depression on May 1, 2005, for which he was prescribed Lexapro. (R. at 192, 203.) Plaintiff visited Dr. Taylor's practice approximately 33 times between his first visit in May 2001 and July 2010.[6] (R. at 192–206.)

On July 26, 2010, and on August 9, 2010, Plaintiff visited Dr. Taylor, who prescribed Percocet for pain. (R. at 206–07.) On August 25, 2010, Plaintiff again met with Dr. Taylor and complained of pain in his clavicle and ribs. (R. at 208.) Dr. Taylor prescribed continued Percocet and added Lisinopril (for high blood pressure). (*Id*.) On September 23, 2010, Dr. Taylor noted that Plaintiff's arm was still in a sling and that he was walking with a cane. (*Id*.) Dr. Taylor continued Plaintiff's previously prescribed medications and also prescribed Lexapro, an antidepressant and anti-anxiety medication. (*Id*.) In October 2010, Plaintiff told Dr. Taylor that his pain was well controlled although his shoulder was still in a sling. (R. at 288.) On December 2, 2010, Plaintiff told Dr. Taylor that the pain was well controlled, and Dr. Taylor noted that Plaintiff had improved shoulder abduction. (*Id*.) On January 13, 2011, Dr. Taylor noted that Plaintiff walked with a disturbed gait and had a limp, and diagnosed "derangement" of the left knee. (R. at 287.) On March 30, 2011, Plaintiff complained of pain and informed Dr. Taylor that the Percocet was no longer effective. (R. at 286.) Dr. Taylor noted that Plaintiff was

---

[6] It appears that Plaintiff saw different physicians at this practice, as indicated by different signatures and handwriting. A signature similar in appearance to the signature of Dr. Taylor on the Residual Functional Capacity Questionnaire first appears in Plaintiff's medical records on August 13, 2001, and appears in the majority of entries for Plaintiff's subsequent visits. (R. at 196; *see* R. at 295.)

uncomfortable and still had the "non union clavicle fracture" and "probable lumbar disc D2," and prescribed Norco.[7] (*Id.*) On April 13, 2011, Plaintiff complained to Dr. Taylor that Norco was not effective, that he was depressed and had limited range of motion. (*Id.*)

Dr. Taylor and other physicians at Staten Island Physician Practice ordered diagnostic tests beginning in April 2011. An X-ray ordered by Dr. Taylor and taken on April 21, 2011, revealed "mild degenerative changes of the lumbar spine." (R. at 273.) An MRI ordered by Dr. Ida Althshuler and taken on May 10, 2011, indicated "mild focal spondylosis at C5–6," and "calcification at the atlantoaxial joint which may reflect CPPD [calcium pyrophosphate deposition]." (R. at 274.) On May 12, 2011, Dr. Taylor diagnosed Plaintiff as having lumbar disc disease and nonunion clavicle fracture, and he continued Plaintiff's medications. (R. at 285.) Between June 16 and October 16, 2011, Plaintiff visited Dr. Taylor five times, complaining on three of these occasions that the pain was "not well controlled." (R. at 283–85.) On June 16, 2011, Dr. Taylor changed Plaintiff's painkiller prescription to Roxicodone, and on July 14, 2011, increased the dosage. (R. at 284–85.) Dr. Taylor noted that Plaintiff walked with a cane, and diagnosed cervical disc D2, clavicle fracture and left cervical ligament tear. (R. at 284.) On November 4, November 30 and December 8, 2011, Plaintiff reported that his pain was under control during his visits to Dr. Taylor. (R. at 282.) On January 8, 2012, Plaintiff complained to Dr. Taylor that he was very anxious and having difficulty sleeping and urinating, and Dr. Taylor prescribed Valium. (R. at 280.) On January 18, 2012, Dr. Taylor noted that

---

[7] "Norco is a combination medication (hydrocodone and acetaminophen) that is used to relieve moderate to severe pain." *Rodriguez v. Astrue*, No. 12-CV-4103, 2013 WL 1282363, at *4 n.26 (E.D.N.Y. Mar. 28, 2013) (citing *Norco Oral,* WebMD, http://www.webmd.com/drugs/drug-63-Norco+oral.aspx?drugid=63&drugname=Norco+oral&source=1).

Plaintiff was weaned off Roxicodone after complaining of "altered MS," and started on Dilaudid.[8] (R. at 279.) On January 25, 2012, Plaintiff reported that his pain was controlled, and was started on Opana. (*Id.*)

On February 3, 2012, Ms. Naravaez took Plaintiff to the emergency room of Staten Island University Hospital reporting that she could not wake him up and that he had taken more than the usual dosage of his pain medication. (R. at 281.) Dr. Taylor was the attending physician in the emergency room and diagnosed Plaintiff with accidental overdose of opioid analgesics. (*Id.*) In a follow-up visit with Dr. Taylor on February 9, 2012, Plaintiff reported that his pain was reasonably controlled, and Dr. Taylor prescribed Contin and Cymbalta. (R. at 279.) On March 4, 2012, Dr. Taylor prescribed Opana and Dilaudid, and on April 4, 2012, after Plaintiff complained that his pain was not well controlled, Dr. Taylor increased the Dilaudid dosage. (R. at 278.)

On April 12, 2012, Dr. Taylor completed a Physical Residual Functional Capacity Questionnaire.[9] (R. at 293–95.) Dr. Taylor noted that Plaintiff had been his patient since 2001 and that he had seen Plaintiff monthly since then. (R. at 293.) Dr. Taylor diagnosed Plaintiff with non-union clavicle and lumbar disc disease, noted that the impairments lasted or could be expected to last at least twelve months, and that Plaintiff was not a malingerer. (*Id.*) He noted that Plaintiff "often" experienced pain or other symptoms severe enough to interfere with attention and concentration and that he had moderate limitations in the ability to deal with work

_____

[8] According to the parties, "altered MS" refers to "altered mental states." (*See* Memorandum of Law in Support of Defendant's Motion for Judgment on the Pleadings ("Def. Mem.") 15.; Memorandum of Law in Support of Plaintiff's Cross-Motion for Judgment on the Pleadings ("Pl. Mem.") 9.)

[9] The questionnaire has two dates and two signatures by Dr. Taylor: October 27, 2011, and April 12, 2012. (R. at 295.)

stress. (*Id*.) Plaintiff could walk for one city block without rest, could sit continuously for 15 minutes and stand continuously for 20 minutes, and could stand or walk for less than two hours in an 8 hour workday, and sit for less than 2 hours in an 8 hour workday. (R. at 293–94.) Dr. Taylor noted that Plaintiff needed to walk for 5 minutes every 15 minutes during an 8-hour working day, and that he needed a job that permitted shifting positions between sitting, standing and walking. (R. at 294.) He noted that Plaintiff sometimes would need to take unscheduled breaks approximately every 30 minutes, for 10 minutes. (*Id*.) Plaintiff could lift less than 10 pounds occasionally, had significant limitations in doing repetitive reaching, handling or fingering, and could bend and twist at the waist for approximately 10% of an 8-hour working day. (R. at 295.) Dr. Taylor answered "yes" to the question of whether Plaintiff's impairments were likely to produce "good days" and "bad days," and checked the box indicating that, on average, they would cause Plaintiff to be absent from work three times per month. (*Id*.) Dr. Taylor left blank the question: "Please describe any other limitations (such as psychological limitations . . . need to avoid . . . dust, fumes, gases or hazards, etc.) that would affect your patient's ability to work at a regular job on a sustained basis." (*Id*.) The earliest date the limitations described in the questionnaire applied was August 2010. (*Id*.)

### iii. Dr. Mark Brandon

On August 13, 2010, Plaintiff visited Dr. Mark Brandon of Staten Island Physician Practice, who noted a "mid-clavicle bump" and "no crepitus" along the left shoulder. Dr. Brandon prescribed pain management, gentle stretching exercises, and isometric exercise. (R. at 259–60.) An X-ray conducted on August 13, 2010, indicated a "comminuted,[10] displaced

---

[10] "Comminuted means 'broken into fragments.'" *Cummings v. Bowen*, 677 F. Supp. 975, 977 (N.D. Ill. 1988) (quoting Stedman's Medical Dictionary 303 (5th ed. 1982)).

fracture through the mid aspect of the left clavicle," with "fracture fragments [that] may be overriding by approximately 2.5 cm," and "[o]verlying swelling within the soft tissues." (R. at 261.) On September 17, 2010, Plaintiff told Dr. Brandon that he was also having pain in his left knee. (R. at 262.) Plaintiff had forgotten the sling for his left arm at home that day. (*Id*.) Dr. Brandon noted a palpable callus at mid-clavicle along the left shoulder and that both shoulders had nearly an equal range of motion. (R. at 263.) Dr. Brandon noted "mild" crepitation in Patient's left knee, and that both legs had normal strength and equal range of motion. (*Id*.) Dr. Brandon prescribed continued gentle stretching and strengthening exercises for Plaintiff's clavicle pain, and physical therapy for his knee pain. (*Id*.) An X-ray taken on September 17, 2010 indicated "no significant change in the alignment of the comminuted fracture of the mid clavicle with inferior displacement of the distal fracture fragments." (R. at 254.)

Between February and June 2011, Plaintiff continued to visit Dr. Brandon, complaining of pain. On February 4, 2011, Plaintiff visited Dr. Brandon complaining of left shoulder pain, left knee pain and bilateral hand pain and stiffness. (R. at 253.) Dr. Brandon again noted the mid-clavicle bump along the left shoulder and an X-ray taken that day showed the comminuted fracture in Plaintiff's left clavicle, with no significant change in the position of the overriding fracture fragments. (R. at 257.) A February 22, 2011 MRI of Plaintiff's knee showed that "the medial meniscus is intact without evidence of tear," that there was "blunting of the free edge of the posterior horn of the lateral meniscus, consistent with free edge fraying," and "[i]ncreased signal seen within the anterior cruciate ligament ["ACL"] predominately at the femoral attachment consistent with a probable partial tear . . . ." (R. at 255, 275; Def. Mem. 12; Pl. Mem. 6.) The MRI also showed that the "posterior cruciate ligament" ("PCL") and "medial collateral ligament" ("MCL") were intact. (R. at 255.) On June 10, 2011, Plaintiff returned to Dr.

Brandon complaining of left knee and shoulder pain. (R. at 248.) Dr. Brandon noted that Plaintiff had been noncompliant with his instructions to wear a sling because, as Plaintiff stated to Dr. Brandon, the "SSI Dr." told him he did not need the sling.[11] (*Id*.) Dr. Brandon noted that Plaintiff "developed delayed union left clavicle." (*Id*.) He also noted a "palpable prominence and mid clavicle on left," which was less tender than prior exam, and that both of Plaintiff's shoulders had nearly an equal range of motion.[12] (R. at 249.) Dr. Brandon noted mild crepitation and tenderness in Plaintiff's left knee, that both legs had normal strength and equal range of motion, and that flexion for both knees was 135 degrees. (*Id*.) Dr. Brandon diagnosed lumbago and cervicalgia, instructed Plaintiff on gentle stretching exercises, educated him on using a bone stimulator for the left clavicle and prescribed Neurontin. (R. at 249–50.) An X-ray taken on that day revealed no significant change in the comminuted fracture of the mid left clavicle. (R. at 251.)

### iv. Physical therapy

Plaintiff began physical therapy for left knee patellofemoral syndrome on September 22, 2010. (R. at 209.) Plaintiff complained of constant sharp pain, which he rated as 10 on a scale of 1 to 10, difficulty negotiating steps, and stated that he remained in bed most of the day. (*Id*.) The physical therapist noted "tenderness present medially" along left knee "upon palpation," that Plaintiff's motor strength was 3 out of 5 in his left quadriceps and hamstring, and left knee flexion was to 115 degrees, while the right knee flexion was to 125 degrees. (*Id*.) The therapist

---

[11] Dr. Brandon's notes indicate: "pt was noncompliant with my sling wear instructions as per his order from SSI Dr as per pt and developed delayed union left clavicle."

[12] The "internal rotation 0" lists an "active range" of "T5 degrees" for the right shoulder, and "T4 degrees" for the left shoulder. (R. at 249.)

prescribed moist heat, massage, home exercises and TENS, or transcutaneous electrical nerve stimulation." (*Id*.)

### v.   Dr. Jung L. Hahn, consultative examiner

On November 23, 2010, Plaintiff had a consultative physical examination with Dr. Jung L. Hahn of the New York State Office of Temporary and Disability Assistance. (R. at 218.) Dr. Hahn diagnosed Plaintiff with dysthymic disorder, recommended vocational capacity rehabilitation and pain management, noted that psychiatric treatment and intensive psychotherapy can assist Plaintiff's social readjustment, and opined that Plaintiff was "able to return to work as long as his physical condition is under control and his depressive mood is lifted." (R. at 221.)

### vi.   Dr. Chitoor Govindaraj, consultative examiner

On November 25, 2010, Plaintiff had a consultative physical examination with Dr. Govindaraj of the New York State Office of Temporary and Disability Assistance. (R. at 214.) Dr. Govindaraj reported no abnormalities, that Plaintiff had normal range of motion of the back and joints, normal hand dexterity, normal straight leg raising test, no evidence of swelling "except for the history of fracture that happened in July," and normal gait and posture. (*Id*. at 215–16.) Dr. Govindaraj noted that Plaintiff "was trying to use a . . . sling, which is not needed, not recommended." (R. at 216.) He also noted that Plaintiff did not need a cane or any ambulatory devices, was medically stable and cleared for occupation with no restrictions. (*Id*.)

### vii.   Dr. John Pace, podiatrist

On March 24, 2011, Plaintiff visited Dr. Pace, a podiatrist with the Staten Island Physician Practice, complaining of bilateral foot pain. (R. at 258.) An X-ray taken that day revealed no fractures, dislocations or subluxations, but noted a small subchondral cyst at the

medial distal aspect of the first proximal phalanx of his left foot, at the tip of his left big toe. (R. at 256.) Dr. Pace prescribed physical therapy. (R. at 271.)

### viii.  Dr. Minola, consultative examiner

On January 11, 2011, Dr. Minola,[13] a review psychologist working for the New York State Office of Temporary and Disability Assistance, reviewed Plaintiff's disability claim file, completed a Mental Residual Functional Capacity Assessment and completed a Psychiatric Review Technique. (R. at 222–41.) Dr. Minola noted in the Mental Residual Functional Capacity Assessment that Plaintiff was moderately limited with respect to understanding and memory, and sustained concentration and persistence, but not significantly limited with respect to social interaction and adaptation. (R. at 224–25.) Dr. Minola concluded that Plaintiff had dysthymia,[14] but appeared to be able to understand, remember and carry out simple tasks in a low stress environment and to relate to his peer and supervisors in a work setting. (R. at 225–26.) On the Psychiatric Review Technique, Dr. Minola diagnosed Plaintiff with Affective Disorder, listing dysthymia as the "medically determinable impairment." (R. at 238.) Dr. Minola noted that Plaintiff had mild limitations as a result of (1) restriction of activities of daily living and (2) difficulties in maintaining social functioning, and moderate limitations as a result of difficulties in maintaining concentration, persistence or pace. (*Id.*) Dr. Minola noted that the evidence did not establish the presence of the "C" criteria of the listings. (R. at 239.)

---

[13]  Dr. Minola's first name does not appear in the record.

[14]  "'Dysthymia' refers to a mood disorder involving 'depressed feeling . . . and loss of interest or pleasure in one's usual activities,' but which is not severe enough to constitute a major depression." *Miller v. Barnhart*, No. 01-CV-2744, 2004 WL 1304050, at *3 n.7 (S.D.N.Y. May 6, 2004) (quoting Dorland's Illustrated Medical Dictionary 521 (27th ed. 1988)).

### e. The ALJ's decision

The ALJ conducted the five-step sequential analysis as required by the Social Security Administration under the authority of the Social Security Act. At the first step, the ALJ noted that Plaintiff had not been engaged in substantial gainful activity since July 28, 2010, the application date. (R. at 11.) Second, the ALJ found that Plaintiff had status-post clavicle fracture, status-post rib fracture, hypertension, high cholesterol, asthma, affective disorder, lumbar disc disease, and left knee impairment. (*Id*.) Third, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that meets or medically exceeds the severity of one of the impairments listed in Appendix 1 of the relevant regulation. (*Id*.) He found that Plaintiff's clavicle, rib and knee impairment did not meet or equal Listing 1.02, which requires "evidence of gross anatomical deformity and 'findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis.'" (*Id*.) The ALJ also found that Plaintiff's back impairment did not meet or equal the criteria of Listing 1.04, in that there was insufficient evidence that Plaintiff experiences "nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, and motor loss, sensory and reflex loss." (*Id*.) The ALJ also found that Plaintiff's asthma did not meet the criteria of Listing 3.03, which requires evidence of an asthma attack occurring at least once every two months or at least six times a year. (*Id*.) The ALJ further found that Plaintiff's mental impairments, did not singly or in combination meet the criteria of Listing 12.04. (R. at 12.) In particular, the paragraph B criteria requiring at least two "marked" limitations or one "marked" limitation plus "repeated episodes of decompensation" were not met, and the paragraph C criteria requiring in part "a medically documented history of a chronic affective

disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities" was not met. (*Id.*)

At the fourth step, the ALJ found that Plaintiff had the residual functional capacity to perform medium work as defined by 20 C.F.R. § 416.967(c), with several limitations regarding physical movements, exposure to respiratory irritants, and the types of activities and environment in which Plaintiff could work. (R. at 13.) In making this determination, the ALJ found that there was a "medically determinable impairment that could reasonably be expected to cause the alleged symptoms," but that the "claimant's statement concerning the intensity, persistence, and limiting effects of these symptoms are not credible" to the extent that they were inconsistent with the residual functional capacity assessment. (R. at 13–14.) The ALJ found that the objective medical evidence indicated that Plaintiff had suffered fractures to his ribs and left clavicle, but that exams conducted by Dr. Brandon in August and September 2010 noted that Plaintiff could breathe deeply, indicated a normal neurovascular examination of the upper extremities, and had "normal strength in both his upper and lower extremities." (R. at 14.) The ALJ found that the February 2011 MRI of Plaintiff's knee showed an "increased signal" within the ACL and "free edge fraying" of the lateral meniscus, but also showed that the PCL, MCL and medial meniscus were intact. (*Id.*) The May 2011 MRI of the spine showed "no significant abnormalities," and the X-ray showed only "mild degenerative changes." (*Id.*) The ALJ also cited the X-ray of the lumbar spine performed in April 2011 which "revealed only 'mild degenerative changes.'" (*Id.*) The ALJ noted that a review of Plaintiff's medical record confirmed that Plaintiff "has also been diagnosed with asthma, hypertension, and high cholesterol." (*Id.*)

The ALJ accorded "great weight" to Dr. Govindaraj as an "impartial medical expert," because of Dr. Govindaraj's "thorough in-person examination of [Plaintiff] and a demonstrated

familiarity with his medical history." (*Id*.) The ALJ determined that the opinion of Dr. Taylor, Plaintiff's treating physician, regarding Plaintiff's limitations, as described in Dr. Taylor's April 2012 residual functional capacity assessment was entitled to "little weight," because Dr. Taylor appeared to place "excessive reliance on the claimant's subjective allegations as there is insufficient objective medical evidence to support such a restrictive assessment of the claimant's residual functional capacity," was not met. (R. at 15.)

The ALJ accorded the opinions of Dr. Hahn and Dr. Minola "substantial weight," because their opinions were based on a specialized understanding of psychiatric disorders, were consistent with one another, and were based on a familiarity with Social Security's adjudicative process. (*Id*.) The ALJ found that their opinions indicated that Plaintiff was presently capable of performing simple and routine work, that Plaintiff could carry out simple tasks in a low stress environment and could relate adequately to peers and supervisors in a work setting. (*Id*.) The ALJ also found that Plaintiff was unable to perform any past relevant work, including gas station attendant and construction worker, which are performed at the medium and heavy exertional level and have an SVP of 3 and 4 respectively. (*Id*.)

Finally, at the fifth and final step, considering Plaintiff's age, education, work experience and residual functional capacity, the ALJ found that there were jobs that exist in significant numbers in the national economy that Plaintiff could perform. (R. at 16.) The ALJ noted that Plaintiff has significant exertional demands that prevented him from performing the full range of medium work, but that the vocational expert testified that even with these limitations, Plaintiff could perform the requirements of representative occupations such as hand packager, meat clerk, routing clerk, assembler of small products and mail clerk. (*Id*.) The ALJ noted that each of these jobs involve medium or light work with an SVP of 2. (*Id*.) Because Plaintiff was capable

of making a successful adjustment to other work that exists in significant numbers in the national economy, the ALJ concluded that a finding of "not disabled" was appropriate. (*Id.*)

## II. Discussion

### a. Standard of Review

In reviewing a final decision of the Commissioner, a district court must determine "if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Cichocki v. Astrue*, 729 F.3d 172, 175–76 (2d Cir. 2013) (per curiam) (quoting *Kohler v. Astrue*, 546 F.3d 260, 264–65 (2d Cir. 2008)); *see also Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam). Substantial evidence requires "more than a mere scintilla." *Selian*, 708 F.3d at 417 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (quoting *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008)). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian*, 708 F.3d at 417 (citation and internal quotation marks omitted). Once an ALJ finds facts, the court "can reject those facts only if a reasonable factfinder would *have to conclude otherwise*." *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) (citations and internal quotation marks omitted). In deciding whether substantial evidence exists, the court "defer[s] to the Commissioner's resolution of conflicting evidence." *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012). The Commissioner's factual findings "must be given conclusive effect so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citation and internal quotations omitted). If, however, the Commissioner's decision is not supported by substantial evidence or is based on legal error, a court may set aside the decision of the Commissioner. *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998); *see also Box v. Colvin*, --- F.

Supp. 2d ---, ---, 2014 WL 997553, at *13 (E.D.N.Y. Mar. 14, 2014) ("When reviewing the decision of the Commissioner, the Court may set aside the determination only if the decision was based on legal error or was not supported by substantial evidence in the administrative record."). "The Act must be liberally applied, for it is a remedial statute intended to include not exclude." *Moran*, 569 F.3d at 112 (quoting *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990)).

### b.   Availability of Benefits

Federal disability insurance benefits are available to individuals who are "disabled" within the meaning of the Social Security Act (the "Act"). To be eligible for disability benefits under the Act, the plaintiff must establish his or her inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). The Commissioner has promulgated a five-step analysis for evaluating disability claims. 20 C.F.R. § 404.1520. The Second Circuit has described the steps as follows:

> The first step of this process requires the [Commissioner] to determine whether the claimant is presently employed. If the claimant is not employed, the [Commissioner] then determines whether the claimant has a "severe impairment" that limits her capacity to work. If the claimant has such an impairment, the [Commissioner] next considers whether the claimant has an impairment that is listed in Appendix 1 of the regulations. When the claimant has such an impairment, the [Commissioner] will find the claimant disabled. However, if the claimant does not have a listed impairment, the [Commissioner] must determine, under the fourth step, whether the claimant possesses the residual functional capacity to perform her past relevant work. Finally, if the claimant

18

is unable to perform her past relevant work, the [Commissioner] determines whether the claimant is capable of performing any other work. If the claimant satisfies her burden of proving the requirements in the first four steps, the burden then shifts to the [Commissioner] to prove in the fifth step that the claimant is capable of working.

*Kohler*, 546 F.3d at 265 (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)).

### c. Analysis

Defendant moves for judgment on the pleadings, claiming that the Commissioner's decision is supported by substantial evidence and should be affirmed. (Def. Mem. 18–23.) Plaintiff cross moves for judgment on the pleadings, contending that the ALJ (1) did not correctly weigh the opinions of Plaintiff's treating source, (2) improperly considered Plaintiff's complaints about pain in making a credibility determination, and (3) improperly considered on vocational expert testimony. (Pl. Mem. 16, 20–21.)

### i. Treating physician rule

Plaintiff argues that the ALJ's determination that Plaintiff retained the residual functional capacity to perform the demands of medium work is not supported by substantial evidence. (Pl. Mem. 16.) Plaintiff contends that the ALJ improperly rejected the opinion of Plaintiff's treating physician in making this determination and erred in not contacting Dr. Taylor to seek additional information prior to rejecting his opinion. (Pl. Mem. 16–18.) Plaintiff also claims that the ALJ placed undue reliance on the November 2010 report by Dr. Govindaraj who "conducted a one-time examination and did not perform x-rays or otherwise review the existing x-rays showing an ongoing comminuted fracture of the clavicle." (Pl. Mem. 18.) Defendant argues that the ALJ's determination was supported by substantial evidence, and that the ALJ assigned the correct weight to the opinions of Dr. Taylor and Dr. Govindaraj. (Def. Mem. 18; Reply Memorandum of Law in Further Support of Defendant's Motion and in Opposition to Plaintiff's Cross-Motion

("Def. Reply") 1–4.) Defendant argues that the ALJ correctly assigned little weight to Dr. Taylor's questionnaire responses, as the objective medical evidence did not support the functional limitations indicated by Dr. Taylor. (Def. Mem. 20–21; Def. Reply 1–2.)

"A treating physician's statement that the claimant is disabled cannot itself be determinative." *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (quoting *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)); *Micheli v. Astrue*, 501 F. App'x 26, 28 (2d Cir. 2012). But a treating physician's opinion on the "nature and severity" of the plaintiff's impairments will be given "controlling weight" if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the plaintiff's] case record." 20 C.F.R. § 404.1527(c)(2); *see Matta v. Astrue*, 508 F. App'x 53, 57 (2d Cir. 2013) (discussing the treating physician rule); *Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) ("The opinion of a treating physician is accorded extra weight because the continuity of treatment he provides and the doctor/patient relationship he develops place[s] him in a unique position to make a complete and accurate diagnosis of his patient." (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983) (per curiam)); *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) (discussing treating physician rule). A treating source is defined as a plaintiff's "own physician, psychologist, or other acceptable medical source" who has provided plaintiff "with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the plaintiff]." 20 C.F.R. § 404.1502; *Bailey v. Astrue*, 815 F. Supp. 2d 590, 597 (E.D.N.Y. 2011).

An ALJ must consider various factors in determining how much weight to give a treating physician's opinion. *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (citation omitted). Specifically, the ALJ is required to consider: "(1) the frequen[cy], length, nature, and extent of

treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian*, 708 F.3d at 418 (citing *Burgess*, 537 F.3d at 129); *see also Halloran*, 362 F.3d at 32 (discussing the factors). The ALJ is required to set forth the reasons for the weight he or she assigns to the treating physician's opinion. *Halloran*, 362 F.3d at 32. The ALJ is not required to explicitly discuss the factors, but it must be clear from the decision that the proper analysis was undertaken. *See Petrie*, 412 F. App'x at 406 ("[W]here 'the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability.'" (quoting *Mongeur*, 722 F.2d at 1040)). Failure "to provide good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand." *Sanders v. Comm'r of Soc. Sec.*, 506 F. App'x 74, 77 (2d Cir. 2012); *see also Halloran*, 362 F.3d at 32–33.

Before determining whether the Commissioner's decision is supported by substantial evidence, the court "must first be satisfied that the claimant has had a full hearing under the regulations and in accordance with the beneficent purposes of the Act." *Moran*, 569 F.3d at 112 (alterations omitted) (quoting *Cruz*, 912 F.2d at 11); *see also Perez*, 77 F.3d at 47 ("Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record."). The ALJ has a threshold duty to adequately develop the record before deciding the appropriate weight to give the treating

physician's opinion.[15] *Burgess*, 537 F.3d at 129 ("[A]n ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record." (quoting *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999))); *Collins v. Comm'r of Soc. Sec.*, No. 11-CV-5023, 2013 WL 1193067, at *9–10 (E.D.N.Y. Mar. 22, 2013) (remanding for failure to develop the record); *Hinds v. Barnhart*, No. 03-CV-6509, 2005 WL 1342766, at *10 (E.D.N.Y. Apr. 18, 2005) ("The requirement that an ALJ clarify a treating source's opinion that a claimant is unable to work is part of the ALJ's affirmative obligation to develop a claimant's medical history."); *Pabon v. Barnhart*, 273 F. Supp. 2d 506, 514 (S.D.N.Y. 2003) ("[T]he duty to develop a full record . . . compels the ALJ . . . to obtain from the treating source expert opinions as to the nature and severity of the claimed disability . . . . Until he satisfies this threshold requirement, the ALJ cannot even begin to discharge his duties . . . under the treating physician rule." (alterations in original) (quoting *Peed v. Sullivan*, 78 F. Supp. 1241, 1246 (E.D.N.Y. 1991))). "Because of the considerable weight ordinarily accorded to the opinions of treating physicians, an ALJ's duty to develop the record on this issue is 'all the more important.'" *Rocchio v. Astrue*, No. 08-CV-3796, 2010 WL 5563842, at *11 (S.D.N.Y. Nov. 19, 2010) (citation omitted), *report and recommendation adopted*, No. 08-CV-3796, 2011 WL 1197752 (S.D.N.Y. Mar. 28, 2011). An ALJ's "failure to develop the record adequately is an independent ground for vacating the ALJ's decision and remanding the case." *Green v. Astrue*, No. 08-CV-8435, 2012 WL 1414294, at *14 (S.D.N.Y. Apr. 24, 2012) (citing *Moran*, 569 F.3d at 114–15), *report and recommendation adopted*, No. 08-CV-8435, 2012 WL 3069570 (S.D.N.Y. July 26, 2012).

---

[15] The ALJ is "under an affirmative obligation to develop a claimant's medical history even when the claimant is represented by counsel." *Petrie v. Astrue*, 412 F. App'x 401, 406 (2d Cir. 2011).

The ALJ reviewed the medical record and determined that Dr. Taylor's opinion that Plaintiff had a highly limited residual functional capacity was entitled to "little weight." (R. at 15.) The ALJ found that Dr. Taylor placed "excessive reliance on the claimant's subjective allegations," and concluded that there was "insufficient objective medical evidence to support such a restrictive assessment," (*id*. (citing 20 C.F.R. § 404.1527)). Based on a review of the record, it appears that the ALJ concluded that Dr. Taylor's opinion was not supported by substantial evidence and was not consistent with the record as a whole and, in particular, with the opinions of the consultative physician Dr. Govindraj, or with Dr. Brandon.[16] While the ALJ appears to have implicitly considered the ways in which Dr. Taylor's opinion was *not* supported by the objective medical evidence and were inconsistent with the evidence in the record, the ALJ erroneously failed to acknowledge "the amount of medical evidence supporting the opinion," and the ways in which Dr. Taylor's opinion *was* consistent with the objective medical evidence. *See Johnston v. Colvin*, No. 13-CV-00073, 2014 WL 1304715, at *3 (D. Conn. Mar. 31, 2014) ("In reasoning that [the treating physician's] opinion merited 'little weight,' the ALJ recounted only those aspects of the opinion that were inconsistent with the weight of the objective medical evidence, . . . [but] neglected to acknowledge objective medical evidence in the record that did support Dr. Schwarz's opinion. Failing to do so necessarily means that the ALJ's analysis of how much weight to ascribe to Dr. Schwarz's opinion was lacking."); *Larsen v. Astrue*, No. 12-CV-00414, 2013 WL 3759781, at *2 (E.D.N.Y. July 15, 2013) ("[A]lthough the ALJ did mention evidence in the record that corroborated aspects of [the treating physician's] findings

---

[16] For example, the ALJ first described the X-rays and MRIs, and the findings of Dr. Govindaraj and Dr. Brandon and concluded that they all indicated that Plaintiff did not have significant physical limitations, contrary to Dr. Taylor's conclusion that Plaintiff's residual functional capacity was severely limited. (*See* R. at 14.)

and ultimate conclusions, including the plaintiff's 2009 MRI . . . , the ALJ did not elaborate on how this evidence affected the weight accorded to [the treating physician's] opinions.").

A review of the record shows several consistencies between Dr. Taylor's opinion and other medical evidence in the record, which consistencies were not discussed or acknowledged by the ALJ.  For example, Dr. Taylor's diagnosis of non-union clavicle and resulting limitations may be consistent with Dr. Brandon's notation of "delayed union left clavicle" made on June 10, 2011, and with an X-ray taken that same day, showing no significant change in the comminuted fracture of the mid-left clavicle.  (R. at 249–50.)  Dr. Taylor's diagnosis of lumbar disc disease and resulting limitations also may be supported by an X-ray ordered by Dr. Taylor on April 21, 2011, indicating "mild degenerative changes of the lumbar spine," and an MRI taken on May 10, 2011, indicating "mild focal spondylosis at C5-6," and "calcification at the atlantoaxial joint which may reflect CPPD."  (R. at 286, 273.)

In addition, the ALJ did not acknowledge the "length, nature, and extent of the treatment relationship" between Plaintiff and Dr. Taylor, including the number of times Dr. Taylor examined Plaintiff.[17]  The ALJ also did not consider the fact that Dr. Taylor relied on objective medical evidence in making several of his diagnoses prior to completing the medical source statement.  *See* 20 C.F.R. § 404.1527(c)(2)(ii) ("Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.").

---

[17]  Plaintiff's treatment relationship with Dr. Taylor's practice began in 2001, and between July 2010, the date of the onset of Plaintiff's alleged disability, and April 4, 2012, Dr. Taylor saw Plaintiff twenty-five times.  (*See* R. at 208, 278–88.)

The ALJ's treatment of Dr. Taylor's opinion contrasts sharply with his treatment of Dr. Govindaraj's opinion. The ALJ cited the fact that Dr. Govindraj conducted a comprehensive physical examination, and that he demonstrated a familiarity with Plaintiff's medical history in explaining his decision to accord Dr. Govindaraj's opinion "great weight." (R. at 14.) Although the fact that Dr. Govindraj performed a physical examination weighs in favor of according his opinion greater weight than would have been accorded had he not performed the physical examination, *see* 20 C.F.R. § 404.1527(c)(1), the fact that he performed only one examination, on a consultative basis, undermines the weight accorded to his opinion. *See id*. § 404.1527(c)(2)(i), ("When the treating source has seen [a claimaint] a number of times and long enough to have obtained a longitudinal picture of [the claimant's] impairment, we will give the source's opinion more weight than we would give it if it were from a nontreating source."). In addition, Dr. Govindraj did not appear to review any medical tests, and much of the objective medical evidence, including X-rays and MRIs, documenting Plaintiff's ongoing problems were taken subsequent to Dr. Govindaraj's examination. These facts weigh against according great weight to his opinions. *See id.* § 404.1527(c)(3) ("[B]ecause nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources."); *Selian*, 708 F.3d at 419 (reversing district court affirmation of ALJ denial of benefits, where "the ALJ credited the findings of [the consultative examiner] over [the treating physician's] views, even though [the consultative examiner] performed only one consultative examination (and this examination occurred before [the treating physician] suspected that Selian might have been suffering from fibromyalgia)," and

noting that "[w]e have previously cautioned that ALJs should not rely heavily on the findings of consultative physicians after a single examination").

The ALJ also failed to discuss the ways in which Dr. Govindraj's opinion conflicted with the opinion of other medical providers or with the evidence in the record. Specifically, Dr. Govindaraj, upon physical examination in November 2010, determined that Plaintiff's clavicle was "normal." (R. at 216.) This directly contradicts the medical examination by Dr. Brandon two months earlier, on September 17, 2010, during which Dr. Brandon noted a "palpable callus at mid-clavicle" along Plaintiff's left shoulder, and the examination three months later, on February 4, 2011, during which Dr. Brandon noted a mid-clavicle bump along the left shoulder. Dr. Govindaraj's assessment also conflicts with X-rays and taken on September 17, 2010, and on February 4, 2011, both indicating comminuted fracture of the left clavicle. (R. at 254, 257.) Dr. Govindraj also determined that there was no evidence of "subluxation, contractures, ankylosis, instability, redness, heat, or swelling noted *except for the history of fracture that happened in July*." (R. at 216 (emphasis added).) Accordingly, Dr. Govindaraj's opinion from November 2010 that Plaintiff's clavicle was "normal" and that Plaintiff was suffering from a "past history of clavicle fracture" rather than an ongoing fracture, conflicts with other evidence in the record, a conflict the ALJ did not acknowledge. (R. at 14.) Nor did the ALJ reconcile Dr. Govindaraj's November 2010 opinion with the objective medical evidence from X-rays and MRIs that documented that Plaintiff's fractured clavicle remained "comminuted" through June 2011. (*See* R. at 251.)

Although it is ultimately "up to the agency, and not the court, to weigh the conflicting evidence in the record," *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998) (alteration omitted), where an ALJ does not appear to have taken into consideration the factors

required by the treating physician rule, the Court cannot find that the ALJ's determination is supported by substantial evidence.  *See Rolon v. Comm'r of Soc. Sec.*, No. 12-CV-4808, 2014 WL 241305, at *9 (S.D.N.Y. Jan. 22, 2014) ("[I]n identifying and resolving these conflict[ing] evidence in the record], the ALJ still must apply the treating physician rule."); *cf. Brogan-Dawley v. Astrue*, 484 F. App'x 632, 634 (2d Cir. 2012) (treating physician's opinions need not be given controlling weight when they contradict other evidence in the record and the ALJ considered them and "provide[d] good reasons for discounting them" (alteration in original) (citations omitted)).  Because the ALJ's determination that Dr. Taylor's opinion was entitled to "little weight" and Dr. Govindaraj's opinion to "great weight" was the result of an incomplete analysis of the relevant regulatory factors, the Court remands for a proper application of the factors set forth in the treating physician rule.

Plaintiff argues that "before rejecting a treating source, the ALJ is under a duty to recontact the treating source to determine if there is some additional evidence that might address the ALJ's concerns regarding supportability of the opinion."  (Pl. Mem. 18 (citing *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998)).)  However, this is only required when the administrative record is not complete.  *See Schaal*, 134 F.3d at 505 (discussing ALJ error in not recontacting the plaintiff's treating physican where there was an overall "lack of clinical findings" in the administrative record); *Burgess*, 537 F.3d at 129 ("In light of the ALJ's affirmative duty to develop the administrative record, 'an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record.'" (quoting *Rosa v. Callahan,* 168 F.3d 72, 79 (2d Cir. 1999)).  "[W]here there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits

claim." *Petrie*, 412 F. App'x. at 406 (quoting *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999)).

Here, the ALJ had a considerable and well-developed administrative record before him, and Plaintiff does not contend that there were any obvious gaps or deficiencies in the record.[18] In light of the extensive medical record before the ALJ, his error was not in failing to develop the record before reaching a conclusion, but in failing to consider more of the relevant information in the record before arriving at his conclusion. The Court remands for a proper application of the factors set forth in the treating physician rule. The Court also finds that there is ample evidence in the comprehensive administrative record to permit the ALJ to apply the relevant factors.

### ii. Credibility determination

Plaintiff argues that the ALJ failed to account for Plaintiff's prior efforts to address pain and the types of medications used to address pain, as required by the Social Security Administration regulation. (Pl. Mem. 20–21 (citing 20 C.F.R. § 404.1529(c)(3)(iv)).) Plaintiff argues that "efforts to treat pain generally enhance a claimaint's overall credibility," and argues that the ALJ erred by failing to acknowledge that Plaintiff's pain was significant enough to require narcotic pain medication and that Plaintiff complained of drowsiness from the

---

[18] Plaintiff's citation to *Santiago v. Schweiker*, 548 F. Supp. 481 (S.D.N.Y. 1982) for the proposition that "[b]efore denying a claim, the ALJ is 'obligated, at the very least, to advise [Plaintiff] that he considered his case unpersuasive, and to suggest that he produce additional medical evidence," is inapposite. (Pl. Mem. 18 (citing *Santiago*, 548 F. Supp. at 486).) *Santiago* involved a claim in which the ALJ did not cite a treating physician's opinion, and the cited text expressly discussed the ALJ's obligation to assist *pro se* claimants. *See Santiago*, 548 F. Supp. at 485–86 ("Even if the ALJ had applied proper legal standards in his evaluation of the evidence, a remand of the case would still be necessary because the ALJ did not take adequate measures to safeguard the rights of this *pro se* claimant."). In this case, Plaintiff was represented at trial, (*see* R. 299–301), and while the ALJ's duty to develop the record is the same irrespective of whether a claimant is represented or *pro se*, in light of the extensive medical evidence in the record, the ALJ was in no way obligated to "suggest that [Plaintiff] produce additional medical evidence."

medications.  (*Id.* at 20–21.)  Defendant argues that the evidence in the record supports the ALJ's

determination that Plaintiff overstated the intensity, persistence and limiting effects of his

medically determinable impairments, citing evidence that Plaintiff's pain was somewhat relieved

by medication, that he had described his pain as reasonably controlled, controlled or well-

controlled, that doctors had found normal strength and range of motion, and that X-rays indicated

"only mild degenerative changes" of Plaintiff's lumbar spine.  (Def. Reply 5–7.)

While SSA regulations require an ALJ "to take the claimant's reports of pain and other

limitations into account, he or she is not required to accept the claimant's subjective complaints

without question."  *Campbell v. Astrue*, 465 F. App'x 4, 7 (2d Cir. 2012) (alteration omitted)

(quoting *Genier*, 606 F.3d at 49).  Rather, the ALJ evaluates the claimants' contentions of pain

through a two-step inquiry.  First, "the ALJ must decide whether the claimant suffers from a

medically determinable impairment that could reasonably be expected to produce the symptoms

alleged," including pain.  *Genier*, 606 F.3d at 49 (2d Cir. 2010) (citing 20 C.F.R. § 404.1529(b)).

"If so, the ALJ must then consider 'the extent to which [the claimant's] symptoms can

reasonably be accepted as consistent with the objective medical evidence and other evidence of

record.'"  *Campbell*, 465 F. App'x at 7 (alteration in original) (quoting *Genier*, 606 F.3d at 49).

At the second stage, the ALJ must first consider all of the available medical evidence, including

a claimaint's statements, treating physician's reports, and other medical professional reports.

*Whipple v. Astrue*, 479 F. App'x 367, 370–71 (2d Cir. 2012).  To the extent that a claimaint's

allegations of pain "are not substantiated by the objective medical evidence, the ALJ must

engage in a credibility inquiry."  *Meadors*, 370 F. App'x at 184 (citing § 404.1529(c)(3)(i)–

(vii)).  In conducting the credibility inquiry, the ALJ must consider seven factors.[19]

In this case, the ALJ engaged in the two-step inquiry required of him.  He noted that Plaintiff alleged that he experiences pain in his clavicle, that he gets tired easily, spends a good portion of the day lying down and notes that his pain is constant, although pain medication provides some relief.  (R. at 13–14.)  The ALJ determined that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but concluded that the intensity, persistence, and limiting effects of those symptoms were not credible.  (R. at 14.)  The ALJ relied heavily on the objective medical evidence.   The ALJ described two of the seven factors required by § 404.1529(c)(3), including the location, duration, frequency and intensity of Plaintiff's pain, the fact that Plaintiff takes pain medication which are somewhat effective, and other measures Plaintiff has taken to relieve his pain, such as spending a good portion of his day lying down and using a cane.  (R. at 13–14.)  However, the ALJ does not appear to have considered Plaintiff's daily activities, precipitating and aggravating factors, or the type, dosage or side effects of Plaintiff's medications.  In light of Plaintiff's extensive and well-documented complaints of pain to his treating physician and Dr. Brandon, (*see* R. at 248), as well as to a physical therapist, (*see* R. at 209), the ALJ's failure to consider all of the factors he was required to consider in making a credibility determination of Plaintiff's contentions of pain is legal error

---

[19] The factors are:

(1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medications taken to alleviate the pain; (5) any treatment, other than medication, that the claimant has received; (6) any other measures that the claimant employs to relieve the pain; and (7) other factors concerning the claimant's functional limitations and restrictions as a result of the pain.

20 C.F.R. § 404.1529(c)(3)(i)–(vii); *Meadors v. Astrue*, 370 F. App'x 179, 183 n.1 (2d Cir. 2010) (quoting 20 C.F.R. § 404.1529(c)(3)(i)–(vii)).

and cause for remand. *See Verdaguer v. Colvin*, No. 12-CV-6858, 2013 WL 6426931, at *10 (S.D.N.Y. Dec. 9, 2013) ("[T]he ALJ erred when he provided no analysis of the 'type, dosage, effectiveness, and side effects of any medication' Plaintiff 'take[s] or ha[s] taken to alleviate [his] pain or other symptoms,' as he was required to do." (quoting 20 C.F.R. § 404.1529(c) (3)(iv))); *Kane v. Astrue*, 942 F. Supp. 2d 301, 314 (E.D.N.Y. 2013) (finding that the ALJ erred in the credibility determination of a claimant's contention of pain where the ALJ failed to "identify what facts he found to be significant, or indicate how he balanced the various factors," and did not "address how Plaintiff's continuous treatment for pain over a more than two-year period, including numerous medications . . . affects Plaintiff's credibility" (quoting *Simone v. Astrue,* No. 08-CV-4884, 2009 WL 2992305, at *11 (E.D.N.Y. Sept. 16, 2009))); *Correale-Englehart v. Astrue*, 687 F. Supp. 2d 396, 437 (S.D.N.Y. 2010) (finding that the ALJ erred in discounting plaintiff's reports of taking pain medication, noting that "[t]he fact that plaintiff was taking such pain medication over a two-year period is, if anything, another indication that she was experiencing serious pain since the motor vehicle accident," and that "the ALJ failed to mention other medications — including Ambien, Naprosyn, Celebrex, amitriptylin and Zanaflex — that plaintiff had taken over the two-year period and how they affected her overall functioning, again failing to take into account all pertinent evidence"). The Court remands for reconsideration of all of the factors required by § 404.1529(c)(3). *See Meadors*, 370 F. App'x at 185 ("on remand, the ALJ should be mindful to consider each of the factors set forth in § 404.1529(c)(3)").

### iii. Vocational expert testimony

Plaintiff contends that the testimony of the vocational expert ("VE") regarding the types of medium-level jobs that could be performed by Plaintiff conflicted with the "Selected

Characteristics of Occupations," ("SCO") a companion database to the Dictionary of Occupational Titles (DOT), and that the ALJ erred in not asking the VE whether her testimony conflicted with the SCO. (Pl. Mem. 22–23.) Plaintiff argues that as a result, the VE inappropriately identified "hand packager" as one of the jobs that Plaintiff could perform. (*Id*. at 23.) Plaintiff notes that the ALJ asked the vocational expert to "identify jobs that an individual could perform where they were limited to medium work . . . which avoids concentrated exposure to dust orders [sic], gases, poor ventilation and other respiratory irritants," but that the vocational expert identified "hand packager," which, according to the SCO, "exposes workers to 'frequent' atmospheric conditions," and thus could not possibly be appropriate for an individual who needed to avoid concentrated exposure to respiratory irritants. (Pl. Mem. 22–23.) Plaintiff also asserts that it was "improper" for the ALJ to ask the VE to identify jobs at a "light" exertional level, because "if [Plaintiff] was limited to light work, he would necessarily be found disabled by operation of the medical vocational rules." (*Id*. at 24.)

The Commissioner argues that the ALJ did not err, as he asked the VE whether her opinion was consistent with the DOT, and the relevant SSA regulation considers the SCO to be a "companion publication" to the DOT, and therefore it was not necessary for the ALJ to inquire about the SCO separate and apart from the DOT. (Def. Reply 8.) The Commissioner also notes that Plaintiff did not raise this objection during the administrative hearing. (*Id*. at 7.)

Social Security Administration regulations provides that "before relying on VE or [vocational specialist ("VS")] evidence to support a disability determination or decision, our adjudicators must . . . [i]dentify and obtain a reasonable explanation for any conflicts between occupational evidence provided by VEs or VSs and information in the Dictionary of Occupational Titles (DOT), including its companion publication, the Selected Characteristics of

Occupations Defined in the Revised Dictionary of Occupational Titles (SCO)," [20] *Policy Interpretation Ruling : Titles II & Xvi: Use of Vocational Expert & Vocational Specialist Evidence, & Other Reliable Occupational Info. in Disability Decisions*, SSR 00-4P (S.S.A Dec. 4, 2000).

At the hearing, the VE acknowledged that she was being asked to provide her estimate of the number of jobs available to an individual who, among other things, had to avoid concentrated exposure to certain respiratory irritants.  (R. at 316.)  The VE provided her estimate as to the number of jobs available in the local economy and in the national economy that were "at the medium level with those restrictions."  (*Id.*)   She further explained that "any other jobs would involve . . . at least moderate exposure" to dust or fumes.  (*Id.*)

Plaintiff relies on the Selected Characteristics of Occupations table, which classifies the "absence or presence of . . . environment condition components," into one of four categories: Not Present; Occasionally (Activity or condition exists up to 1/3 of the time); Frequently (Activity or condition exists from 1/3 to 2/3 of the time); Constantly (activity of condition exists 2/3 or more of the time.[21]  (Pl. Opp'n Mem. Ex. C at 1; *see also* United States Department of Labor, Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles,

---

[20]  Although the DOT and SCO are separate physical publications, at least one online database integrates the information from the Selected Characteristics of Occupation into the Dictionary of Occupational Titles.  *See, e.g*., Dictionary of Occupational Titles, Fourth Edition, Revised 1991, Occupational Group Arrangement, 920.587-018 PACKAGER, HAND, 1991 WL 687916.

[21]  Appendix D of the Selected Characteristics of Occupations explains that:
> Environmental Condition components within the USES Occupational Analysis Program provide a systematic means to describe fourteen possible surroundings or settings in which the occupation is found or the job may be performed.  For thirteen of these factors [including atmospheric conditions], analysts

("Selected Characteristics of Occupations"), at ID-2, available at

http://onlineresources.wnylc.net/docs/SelectedCharacteristicsSearch121110.pdf.)   This

classification system refers to the frequency, or proportion of time that a particular

environmental condition is or may be present, rather than to the quantity or magnitude of the

environmental condition.   Accordingly, the classification of the hand packager job as one subject

to "frequent" atmospheric conditions does not conflict with the ALJ's asking the VE about jobs

with a restriction of avoiding "concentrated exposure" to certain respiratory irritants.   Absent

evidence of any *actual* conflict, the ALJ's failure to ask whether the VE's testimony conflicted

specifically with the SCO is not legal error.  *See Peck v. Astrue*, No. 07-CV-3762, 2010 WL

3125950, at *10 (E.D.N.Y. Aug. 6, 2010) (finding no error where the ALJ did not ask vocational

expert whether she understood that she would have to advise the hearing officer of a conflict

between her testimony and the DOT or SCO, and noting that "[r]ead in context . . . , it is clear

that the Regulations do not require an ALJ to ask a rote question when there is no indication a

conflict exists" (citing *Salmini v. Comm'r of Soc. Sec.*, 371 F. App'x 109, 114 (2d Cir. 2010));

*see also Hope v. Astrue*, No. 10-CV-93, 2011 WL 2135054, at *4 (C.D. Cal. May 31, 2011)

(finding no error in ALJ's reliance on vocational experts testimony that jobs as a hand packager

existed in significant numbers for an individual whose limitations included, *inter alia*, "medium

work in an environment without dust, fumes, and extreme temperatures," where "the vocational

---

determine whether a factor is absent or present. When they
determine that a factor is present, they then determine whether it
has an effect on the occupation in terms of its frequency of
occurrence.

Selected Characteristics of Occupations, Appendix D, at D-1.  This section also defines
"Atmospheric Conditions" as "[e]xposure to such conditions as fumes, noxious odors, dusts,
mists, gases, and poor ventilation, that affect the respiratory system, eyes, or the skin."  *Id*. at D-
2.

expert made clear, in reaching this conclusion, she had . . . reduced the number of hand packager jobs by 50% to account for" all of the claimant's limitations).

Plaintiff's argument that the ALJ improperly asked the VE about jobs at the light exertional level is without merit. The ALJ asked the VE about jobs available to an individual who had "the residual functional capacity to perform the functional range of medium work," (i.e. at the exertional level of medium), with certain functional limitations. [22] (R. at 315.) It is impermissible for an ALJ to rely on jobs that are categorized at a *higher* exertional level than the ALJ determines a claimant to be limited to. *See Mimms v. Heckler*, 750 F.2d 180, 186 (2d Cir. 1984) ("Although both the ALJ in his opinion, and the vocational expert in her testimony at the hearings, concluded that the claimant's vocational capacity was for *sedentary,* semi-skilled positions, the jobs selected by the expert and relied upon by the ALJ, as being appropriate, require the capacity to perform *light* work. Consequently, we must conclude that the Secretary failed to demonstrate the existence of substantial gainful employment of a sedentary nature, which the claimant was capable of performing."). However, it was not improper for the ALJ to ask about jobs classified at a *lower* exertional level, which require less strength than a claimaint is determined to have. *See* 20 C.F.R. § 416.967(c) ("Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light

---

[22] Residual functional capacity is "expressed in terms of the exertional levels of work, sedentary, light, medium, heavy and very heavy," and determined together with an individual's functional limitations. *See Pettaway v. Colvin*, No. 12-CV-2914, 2014 WL 2526617, at *1 (E.D.N.Y. June 4, 2014) (quoting Social Security Ruling 96-8p, *Titles II & Xvi: Assessing Residual Functional Capacity in Initial Claims*, (S.S.A July 2, 1996)); *see also* 20 C.F.R. § 416.967 (defining physical exertion requirements).

work."). There is nothing in the disability determination process that requires an ALJ to rely solely on jobs that are classified within a rigidly narrow band of functional capacity — *i.e.*, jobs that require neither more nor less than precisely a claimant's residual functional capacity.

Here, the ALJ determined that Plaintiff "has the residual functional capacity to perform medium work as defined in 20 C.F.R. 416.967(c)," with certain functional limitations. (R. at 13.) Thus, Plaintiff's hypothetical that "if the ALJ found that [Plaintiff] was limited to light work, he would necessarily be found disabled by the operation of the medical vocational rules," is irrelevant, as the ALJ did not make such a finding; he found that Plaintiff was limited to medium work. The ALJ asked the VE about work at this exertional level (medium), with the relevant functional limitations, and he did not err in asking about work at a lower exertional level.[23] (R. at 315–16.)

### III. Conclusion

For the foregoing reasons, Defendant's motion for judgment on the pleadings is denied. Plaintiff's cross motion for judgment on the pleadings is granted. The Court finds that the ALJ erred by failing to properly apply the treating physician rule, and failing to properly assess Plaintiff's credibility. The Court declines to find that the ALJ erred in failing to develop the record or in relying on the vocational expert testimony. The Commissioner's decision is vacated

---

[23] Plaintiff also argues that "with respect to the job as a meat clerk, we simply rely on the fact that no individual could possibly perform the lifting and carry demands," of the job with a comminuted and fractured clavicle bone and a torn ACL. (Pl. Mem. 23.) As Defendant notes, Plaintiff "[i]n essence is asserting that he cannot do medium work." (Def. Reply 8.) Because the Court remands on other grounds, Plaintiff's argument is moot, and the Court will not resolve whether Plaintiff is capable of performing the work requirements of a job classified as medium.

and this action is remanded for further administrative proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g).  The Clerk of Court is directed to close this case.

SO ORDERED:

_____
s/MKB
MARGO K. BRODIE
United States District Judge

Dated: August 14, 2014
       Brooklyn, New York